# Commonwealth v. Feathers

C.P. of Lycoming County, No. CR: 892-2013.

*Eileen Dgien,* for Commonwealth.
*Kirsten Gardner,* for defendant.

BUTTS, *P.J.,* October 30, 3013—The defendant filed a motion to suppress evidence on July 18, 2013. A hearing on the motion was held on September 18, 2013.

## Background

On March 2, 2013, Officer Gregory F. Drollinger (Drollinger) of the Montgomery Police Department was dispatched to Brooks Street for a report of a burglary in progress. A witness had called police dispatch and reported that an unfamiliar vehicle was parked at a neighbor's house and that individuals were going to and from the house and the vehicle. Drollinger arrived at the address and knocked on the door. After a delay, Drollinger was about to break the door-in when an individual answered. All the individuals in the house were ordered to the ground, placed in handcuffs, and detained while they were identified. Drollinger and three (3) other officers had their guns drawn during the incident and had detained the individuals for approximately twenty (20) minutes. After the individuals in the house complied with the officers it was confirmed that there was no burglary in progress and all suspicion had ceased.

Each person in the house was individually taken to a separate area, told why the officers had arrived, given their identification, and told they were free to leave. The

defendant had been taken to the bottom of a staircase. When Drollinger told the defendant she was free to leave he noticed that she appeared anxious and nervous. Drollinger asked the defendant if a vehicle outside belonged to her because while he was identifying the occupants he saw that the defendant's driver's license had been suspended. The defendant initially denied that one of the vehicles belonged to her but eventually said it was hers. Drollinger then asked the defendant if she did drugs and she responded "not anymore." Drollinger asked the defendant if she would remove items from her pockets and she complied, resulting in the officer finding unopened packets of Suboxone. The suboxone was described as a piece of paper. As a result, the defendant was charged with one count of possession of a controlled substance, an ungraded misdemeanor.[1]

## Motion to Suppress

The defendant argues she was being held in an illegal investigative detention and therefore her consensual search should be suppressed under the exclusionary rule. The Commonwealth, however, argues that the interaction was a mere encounter and that even if it was an investigative detention there was reasonable suspicion. The Pennsylvania Courts have defined three forms of police-citizen interaction: (1) mere encounter; (2) investigative detention; and (3) custodial detention. A mere encounter between police and a citizen "need not be supported by any level of suspicion, and carries no official compulsion on the part of the citizen to stop or to respond." *Commonwealth v. Ellis*, 541 Pa. 285, 293-94, 662 A.2d 1043, 1047 (Pa. 1995). If a police action becomes too intrusive, a mere encounter may escalate to an investigatory detention or seizure. *Commonwealth v.*

---

1. 35 P.S. §780-113(a)(16).

*Boswell*, 554 Pa. 275, 721 A.2d 336, 339-40 (Pa. 1998).

For the determination of whether a mere encounter has risen to an investigatory detention, the court must determine whether police have conducted a seizure of the person involved. *Commonwealth v. Mendenhall*, 552 Pa. 484, 715 A.2d 1117, 1119 (Pa. 1998).

> To decide whether a seizure has occurred, we apply the following objective test: a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. In applying this test, it is necessary to examine the nature of the encounter. Circumstances to consider include, but are not limited to, the following: the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Commonwealth v. Beasley*, 761 A.2d 621, 625-26 (Pa. Super. 2000). In addition, the court is to consider the nature of any prior seizure, whether there was a clear and expressed endpoint to any such prior detention, and the presence or absence of express advice that the citizen-subject was free to decline the request for consent to search. *Commonwealth v. Freeman*, 757 A.2d 903, 906-07 (Pa. 2000). "[W]hen an individual has been subjected to a valid detention and the police continue to engage that person in conversation, the citizen, having been in official

detention, is less likely to understand that he has the right to refuse to answer questions or a search." *Commonwealth v. Moyer*, 954 A.2d 659, 665 (Pa. Super. 2008) (emphasis in original) (citing *Commonwealth v. Strickler*, 757 A.2d 884 (Pa. 2000)).

In *Moyer*, two officers in uniform pulled over a defendant for having a hole in the taillight of his vehicle and questioned him about his whereabouts. *Moyer*, 954 A.2d at 661. The officers initiated a search of the defendant's criminal history after he appeared nervous and had bloodshot eyes. The defendant's criminal history revealed a previous arrest for possession of marijuana. Subsequently, the officers ordered the defendant out of the vehicle, showed him the hole in the taillight, and told him to have it repaired. The officers then told the defendant he was free to leave but before he re-entered his vehicle an officer requested to ask a few questions. Following the questioning, the defendant consented to a search of his vehicle and person.

The Superior Court of Pennsylvania, *en banc*, found that the consent to search occurred during an illegal investigatory detention. The Superior Court stated that the officers created an intimidating atmosphere during the initial stop because they ordered the defendant out of the car to look at the taillight and by asking about his whereabouts. Further, the officer re-questioned the defendant shortly after saying he was free to go and thus "there was no precise end to the traffic stop." *Id.* at 667. In addition, there were two armed, uniformed officers standing with the isolated defendant outside his vehicle, the officers had activated their lights, the defendant was not informed that he did not have to answer any further questions, the officer conveyed the results of his criminal history check, and the officers did not inform the

defendant that he could decline to consent to the search. In conclusion, the Superior Court stated:

> The only factors that would substantiate a finding that a mere encounter occurred herein were that police told Appellee that he was free to leave, did not use a coercive tone, and did not display their guns. However, the record supports the suppression court's assessment that those elements did not outweigh the overwhelming indicia supporting the reasonableness of appellee's belief that he could not refuse the officer's requests for more information and to search his car and person.

*Id.* at 668.

In addition, in *Dales*, an officer stopped a vehicle for excessive tint on windows. *Commonwealth v. Dales*, 820 A.2d 807 (Pa. Super. 2003). The officer observed several air fresheners and a Bactine/medicine type smell. In addition, the defendant acted nervous. After verifying the defendant's license, the officer requested the defendant out of the vehicle and explained proper tint by comparing the defendant's vehicle to the officer's vehicle. The officer then gave the defendant all the documentation taken from him but continued to ask additional questions. The defendant eventually consented to a search of his vehicle, which resulted in contraband being found. The Superior Court found that once the officer gave the defendant his documentation back the initial traffic stop had ended. When the second round of questioning began the Superior Court found that it was an investigative detention based on a hunch and without reasonable suspicion. The Superior Court found that any information found during the investigative detention could not have been used to justify the detention that was already occurring.

In support of the decision in *Dales*, the Superior Court

cited *By*, which actually found that subsequent questioning of a defendant was a mere encounter. *Commonwealth v. By*, 812 A.2d 1250 (Pa. Super. 2002). In *By*, the defendant's vehicle was pulled over for having excessive tint. Two (2) additional officers arrived on the scene and the identities of the four (4) individuals in the vehicle were obtained. It was further found that one of the passengers had given false information about his name and birth date. After the officer gave the defendant a warning for the tinted windows and told he could leave, the officer continued to ask questions. The officer asked if he could search the vehicle but again repeated that the defendant could also leave. The Superior Court found that the subsequent questioning after the initial traffic stop was a mere encounter, citing that the officers returned the defendant's documentation, told the defendant he was free to leave, did not use force/threats, did not block the defendant's path, did not remove a weapon from his holster, and reminded the defendant he could leave after requesting consent to search. *Id.* at 1256-57.

Here, there are many factors that indicate that the questioning by the officers was an investigative detention. First, the nature of the first seizure by the four (4) officers was intimidating as the individuals in the house were forced to the ground by gun point and handcuffed. The defendant was detained for twenty (20) minutes while police investigated whether the individuals in the house were committing a burglary.

Second, each individual was separately taken from the group and talked to about the officers' presence in the house. The officers did not merely tell everyone in detention at once that they were free to go but separated them and questioned them each individually. Specifically, the officers talked to the defendant in the foyer of the

house. While Drollinger testified that he was not blocking the exit out of the house, he isolated the defendant in a smaller room. There was also no indication that the defendant was wearing seasonally appropriate clothing to exit the house for the first week of March.

Third, while Drollinger testified that he told the defendant she was free to leave, there was no endpoint to the previous detention. Immediately after informing the defendant she was free to go he continued to ask questions. Similar to *Moyer*, the continued questioning after being told she was free to leave did not result in a precise end to the detention based on the suspected burglary.

Fourth, and probably most important, Drollinger told the defendant she was free to leave when he was still located in the house. It is counterintuitive for an officer that entered a house full of individuals to stay in the house he mistakenly entered and tell the occupants that they are free to leave the house. As testified by Drollinger, prior to the additional questioning of the occupants in the house he no longer had any suspicion of a burglary. Without any suspicion or probable cause, the officers not only remained in the house but continued to question the defendant.[2]

Finally, the officers never informed the defendant that she did not have to comply with their requests. There was no testimony that any officer told the defendant that she did not have to answer their questions. Moreover, there was no testimony that any officer told the defendant she did not have to consent to a search of her pockets/person. *See By*, 812 A.2d at 1256. While there are factors that support that the interaction was a mere encounter, such

---

2. Typically a warrant is required for police to enter an individual's house. Exigent circumstances are an exception to this rule. This exception, however, does not give the police unlimited access to a house once the exigent circumstances subside.

as the officers no longer had their guns drawn, there was no testimony of force/threats in the second encounter, and Drollinger testified that he told the defendant she was free to leave, the totality of the circumstances clearly weigh in supporting the reasonableness of the defendant's belief that she could not refuse the officer's requests for more information and to otherwise terminate the encounter.

Even though this court has found that the defendant was questioned during a custodial interrogation, the Commonwealth contends that there was still reasonable suspicion. Reasonable suspicion is decided by the court after a review of the totality of the circumstances and a finding that the facts support a reasonable belief that the law is being broken. *Commonwealth v. Fulton*, 921 A.2d 1239, 1243 (Pa. Super. 2007). "In making this determination, we must give 'due weight...to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience." *Id.* (citing *Commonwealth v. Cook*, 735 A.2d 673, 76 (Pa. 1999). To establish reasonable suspicion the officer must be able to articulate specific observations that led him to reasonably conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. *Commonwealth v. Little*, 903 A.2d 1269, 1272 (Pa. Super. 2006).

The Superior Court has found reasonable suspicion in cases where the officer's second interaction with the defendant was an investigative detention. In *Kemp*, an officer pulled over a vehicle for improperly tinted windows. *Commonwealth v. Kemp*, 961 A.2d 1247, 1250 (Pa. Super. 2008). When the driver rolled down the window the officer smelled a strong odor of masking agents (i.e. air fresheners and dryer sheets) and the passengers acted in an evasive manner. In addition, the officer could detect the faint odor

of marijuana emanating from the vehicle and determined that the driver was not licensed to drive. The officer gave the driver a warning and told her "to have a nice day." After the driver started to walk away the officer requested to ask additional questions. The officer once again told the driver she could leave, however, began to question the passenger in the vehicle. The passenger agreed to a search of the vehicle, which resulted in contraband being found.

The Superior Court found that the interaction with police was an investigative detention and not a mere encounter. The Superior Court, however, found that the officer had reasonable suspicion. "[The officer] had sufficient facts at his disposal to support a reasonable suspicion that appellant was in possession of narcotics, and the investigatory detention occurring after the conclusion of the traffic stop was constitutional." *Id.* at 1260.

Similarly, in *Caban*, an officer pulled over a vehicle for speeding. The officer asked the driver where they were going and the passenger interjected that they were going to a birthday party. *Commonwealth v. Caban*, 60 A.3d 120 (Pa. Super. 2012). In addition, the officer observed several air fresheners, perfume, and a bottle of Febreze in the back of the vehicle. The officer ordered the driver out of the vehicle, gave her back her licenses, and told her she was free to leave. As the driver returned to the vehicle the officer asked if she would answer a few more questions. Eventually the driver said she was ready to go and proceeded back to her car. The officer told her to hold on and began to question the passenger. The Superior Court found that the driver and passenger were subject to an investigatory detention and that the officer did possess reasonable suspicion. *Id.* at 128. The Superior Court noted that the vehicle was owned by a third party, the driver acted nervously, the driver and passenger answered

questions inconsistently, and there was a presence of various masking agents in the vehicle. *Id.* at 129.

Here, the Commonwealth argues that information known by police rose to the level of reasonable suspicion since they suspected that the defendant had driven with a suspended license, she acted nervous, and when asked whether she did drugs she responded "not anymore." Although the behavior described by the police could be characterized as "suspicious," it does not appear to collectively point to the commission of *any* crime other than driving on a suspended license.

Drollinger did not testify what about his observations lead him to believe there was reasonable suspicion that criminal activity was occurring. The court fails to see how the defendant stating that she used to use drugs has formed the basis for reasonable suspicion that she currently possesses narcotics or has committed any crime. Further, the officer did not explain why the defendant acting nervously after being forced to the ground by gunpoint was abnormal. The defendant may have merely been confused or concerned when she was told to leave but the officers still remained in the house and continued to question her seemingly without probable cause or exigent circumstances.

Finally, reasonable suspicion must exist prior to an investigatory detention. The officers cannot justify reasonable suspicion based on neutral comments such as those the defendant may have made during the detention, such as she had 'used to take drugs' or that the vehicle outside was hers. Similarly, just the defendant's nervous behavior during the detention cannot be used to support reasonable suspicion. The Commonwealth stated during argument following the hearing that they had a witness to the defendant driving the vehicle. At the suppression

hearing, however, there was no testimony about this witness or when the officers may have been given this information from the witness. The only testimony presented was that Drollinger knew the defendant had a suspended license based on an identification check. With only the assurance that the officers knew prior to the investigatory detention that the defendant acted nervous while being told she was free to leave and that she had a suspended license, this court is unable to find sufficient facts to establish that the officer possessed reasonable suspicion to believe a crime had occurred.

## ORDER

And now, this 30th day of October, 2013, based upon the foregoing opinion, the defendant's motion to suppress is hereby granted. che court finds that Montgomery Police Department's interaction with the defendant was an investigatory detention without reasonable suspicion. Accordingly, it is ordered and directed that any evidence seized as a result of questioning during the custodial detention of the defendant, including the controlled substance Suboxone and any incriminating statements, is hereby suppressed.